NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0722n.06

No. 19-6378

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 30, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiffs-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| SHANNON D. HIXON, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Before: MERRITT, KETHLEDGE, and WHITE, Circuit Judges.

KETHLEDGE, Circuit Judge. A jury convicted Shannon D. Hixon of fentanyl distribution resulting in the death of Kyle Farvour, a veteran struggling with drug addiction. The district court imposed a mandatory sentence of life imprisonment. Hixon now appeals his conviction and sentence on various grounds. We affirm.

I.

Kyle Farvour was living at a residential rehab facility in April 2017, when he contacted his dealer, Harvey Isaac, about obtaining heroin. The morning of April 12, Isaac texted Farvour that "[his] dude just came in town with the fire"—referring to Hixon and his "really, really good heroin." They arranged a deal: for $80, Isaac would deliver Farvour a half-gram of heroin and a new syringe. Around lunchtime, Hixon drove Isaac to the rehab facility and handed him a

packaged substance.  Isaac then met Farvour outside the facility and delivered that substance and a needle.

Around the same time, a friend of Farvour's at the facility, Zhi Jonathan Wong, lost track of Farvour's whereabouts.  Wong heard a bathroom sink running but thought nothing of it until hours later, when he heard the water running still.  Wong "jimmied" the door open and found Farvour bent over the sink.  Wong shook Farvour and administered two doses of Narcan, to no effect.

Paramedics arrived and initially thought Farvour was alive, given his upright body position.  But they found no pulse.  Farvour also had a "foam cone" around his mouth—indicative of a person's struggle to breathe after a fentanyl overdose.  Police found drug paraphernalia on the bathroom sink, some of which later tested positive for fentanyl.  The coroner's office collected Farvour's blood and urine samples for toxicology testing, which revealed a fentanyl blood concentration of almost twice the therapeutic dose.

An investigation into how Farvour obtained the fatal dose of fentanyl led detectives to Hixon.  A federal grand jury thereafter indicted Hixon for conspiracy to distribute Oxycodone pills and a mixture or substance containing fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and distribution of fentanyl resulting in death, in violation of 21 U.S.C. § 841(b)(1)(C).

Hixon's case went to trial, where middlemen (including Isaac) and lower-level dealers testified against Hixon.  The government also introduced cellphone records and testimony from the Kentucky Medical Examiner's Office, among other evidence.  The jury convicted Hixon on both counts.  The district court sentenced him to life imprisonment on the "death resulting" count and to 240 months on the conspiracy count.  This appeal followed.

II.

A.

Hixon argues that the evidence did not support his conviction under § 841(b)(1)(C) for distribution of fentanyl resulting in death. That offense requires proof of two elements: first, that the defendant knowingly or intentionally distributed fentanyl; and second, that a death resulted from that distribution. *See Burrage v. United States*, 571 U.S. 204, 210 (2014). We view the evidence supporting Hixon's conviction in the light most favorable to the prosecution, and decide whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

As to the first element, Hixon contends that he sold Farvour only heroin, not fentanyl, and that Farvour then left the facility to obtain fentanyl from other sources. But the government presented cellphone evidence suggesting that only Hixon could realistically have been Farvour's source that day. One minute after he and Isaac made their deal, Farvour texted his other potential source, Ray, "I was gonna get some from you. Never mind though." Twenty minutes later, after Isaac said that the dope was "very strong," Farvour again told Ray, "never mind. . . bro."

Cellphone-locational data indicated that Farvour never met with Ray that day. Instead, the records showed, Isaac and Hixon met Farvour near his facility around 12:30pm—the same time that Farvour sent his last text message, and around the time Wong first heard the sink running. Hixon counters that Isaac never testified that the substance he sold to Farvour contained fentanyl; but Isaac conceded that the substance was already packaged when Hixon handed it to him. Thus, the evidence supported an inference that Farvour bought drugs only once that day, that he did so from Hixon (through Isaac), and that the drug that Farvour purchased was fentanyl. A rational jury could therefore find that Hixon's distribution of that fentanyl was knowing or intentional.

That leaves the question whether Farvour died from the fentanyl that Hixon sold him. Mike Ward, a toxicologist at the Kentucky Medical Examiner's lab, opined that Farvour "died as a result of a fentanyl overdose" and that Farvour "would have lived" but for the fentanyl in his blood. Ward also explained that Farvour's "foam cone" was one of the "classic signs" of a fentanyl overdose. Moreover, Farvour's body was surrounded by paraphernalia that tested positive for fentanyl.

Hixon emphasizes that Farvour had no fentanyl in his urine; but another government witness, Dr. George Behonick, testified that Farvour died too quickly for the drug to make its way from his blood into his urine. Hixon also cites Farvour's death certificate, which reported Farvour's cause of death as an "acute combined drug toxicity due to cocaine, fentanyl, and gabapentin[.]" But Ward testified that the cocaine had already metabolized into an inactive form, indicating that Farvour had ingested cocaine well before his death; and Farvour's gabapentin levels were in the therapeutic range. Thus, Ward said, the cocaine and gabapentin would not have caused Farvour's death. Nor would the cocaine or gabapentin have interacted with the fentanyl. Finally, Hixon asserts that Farvour's cause of death is necessarily uncertain because the medical examiner did not perform an autopsy upon him. As the deputy coroner made clear at trial, however, there was hardly a need to examine every organ in Farvour's body to know that the level of fentanyl in his blood was lethal. *See generally United States v. Volkman*, 797 F.3d 377, 397 (6th Cir. 2015). The evidence was sufficient to support Hixon's conviction under § 841(b)(1)(C).

Hixon also argues that, to convict him of violating § 841(b)(1)(C), the jury was required to find that the fentanyl he sold was not only a but-for cause of Farvour's death, but also a proximate cause. As Hixon acknowledges, however, we have already rejected that argument. *See United States v. Jeffries*, 958 F.3d 517 (6th Cir. 2020).

B.

Hixon challenges his life sentence on various grounds. We review that sentence for an abuse of discretion. *See United States v. Jeross*, 521 F.3d 562, 569 (6th Cir. 2008).

Hixon argues that the imposition of a mandatory life sentence under § 841(b)(1)(C) is unconstitutional in light of the First Step Act of 2018, and that—as a matter of statutory construction—the district court wrongly concluded that he was subject to a mandatory life sentence under 21 U.S.C. § 841(b)(1)(C) in the first place. We need not address either of those arguments here, however, because the record makes clear both that the district court would have imposed a life sentence in any event and that Hixon's life sentence was reasonable.

As to the first point, even Hixon agrees that the district court made unmistakably clear during Hixon's sentencing hearing that it would have imposed a life sentence even absent a statutory mandate. Near the end of the hearing, to cite only one example, the district court stated:

> [W]e get caught up sometimes in statutory construction, but sometimes life sentences are earned by the individuals through their conduct. And that's what happened in this particular case. All of the factors of 3553 support a life sentence and it would be improper to impose something less than that in this particular case under the facts presented.

Indeed for all practical purposes the district court conducted Hixon's sentencing hearing as if there were no statutory mandate for a life sentence. As an initial matter, it was common ground in the district court that, even absent a statutory mandatory-minimum sentence of life imprisonment, "[t]he applicable sentencing guidelines recommend[ed] a sentence of life imprisonment." Hixon therefore requested—in the event he could avoid a statutory mandatory-minimum of life—"a downward variance and a sentence below the recommended guideline sentence of life." To that end, during the sentencing hearing, defense counsel stated: "if we were in a situation where life isn't mandatory, my primary argument to the Court would be this: He has

a single prior conviction, drug conviction, it's 15 years old." The district court rejected that argument, and refused to vary downward, only after discussing at considerable length the 18 U.S.C. § 3553 factors and the propriety of a life sentence. Among other things, the court pointed out that a death had resulted from Hixon's distribution of fentanyl (the offense for which was convicted on count 2); that in this very case Hixon had also been convicted of conspiring to distribute Oxycodone (the count 1 offense), for which he was responsible for the distribution of more than 20,000 Oxycodone 30 mg tablets; that Hixon was "selling large amounts of drugs really without any thought of the consequences"; and that Hixon "has not shown remorse in any sense of the word at any time in this proceeding"—notwithstanding a lengthy victim-impact statement by Kyle Farvour's sister during the hearing. The court therefore concluded that, "even if we were in a range of not less than 20 years nor more than life, a life sentence would be appropriate and would be imposed in this particular case, because it would be the correct sentence."

Hixon's only argument (apart from his arguments relating to § 841(b)(1)(C)) as to why we should vacate that sentence is that, he says, his life sentence is substantively unreasonable. Hixon contends that the sentence was unreasonable because, he says, "the sentencing court focused almost exclusively on one single factor—the death of the victim." The above recitation of the district court's reasoning refutes that argument by its terms; and of course it was entirely proper for the court to emphasize the victim's death in this case. Hixon also hypothesizes various ways in which his conduct would have been worse, and contends that a life sentence in his case "leaves virtually no room to make future distinctions" between his case and cases of less-culpable defendants whose drug dealing results in a death. (quoting *United States v. Fink*, 502 F.3d 585, 589 (6th Cir. 2007)). But Hixon's responsibility for distributing more than 20,000 high-potency Oxycodone tablets as part of a separate conviction in this case and his lack of remorse for his

crimes, among other things, leave plenty of room for distinctions between this case and others. The district court did not abuse its discretion by imposing a life sentence.

\* \* \*

The district court's judgment is affirmed.