*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0447p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 05-5319

BETTY SUE CONRAD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 03-10104—James D. Todd, Chief District Judge.

Argued: July 19, 2007

Decided and Filed: November 9, 2007

Before: MARTIN and ROGERS, Circuit Judges; HOOD, District Judge.[*]

_____

## COUNSEL

**ARGUED:** David W. Camp, LAW OFFICE OF DAVID CAMP, Jackson, Tennessee, for Appellant. Richard Leigh Grinalds, ASSISTANT UNITED STATES ATTORNEY, Jackson, Tennessee, for Appellee. **ON BRIEF:** David W. Camp, LAW OFFICE OF DAVID CAMP, Jackson, Tennessee, for Appellant. Richard Leigh Grinalds, ASSISTANT UNITED STATES ATTORNEY, Jackson, Tennessee, for Appellee.

_____

## OPINION

_____

BOYCE F. MARTIN, JR., Circuit Judge. Betty Sue Conrad appeals her conviction on one count of conspiracy to possess with intent to distribute in excess of 50 grams of methamphetamine and two counts of possession with intent to distribute methamphetamine. She argues that the district court improperly allowed hearsay evidence under the co-conspirator exception and that there was insufficient evidence to sustain her conviction. For the reasons that follow, we REMAND for further proceedings as instructed below.

---

[*]The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

I.

Betty and her husband, Tony, live in a rural area near Huron, Tennessee.  At the time of trial, Betty was 61 years old.  Betty and her husband are disabled.  Her husband is a paraplegic, resulting from an automobile accident in 1997.  Betty was disabled in a work-related accident in 1987.  Both she and her husband receive Social Security Disability, their only documented income.  Since Tony's accident, Betty has been his personal care giver.  Tony stayed in a hospital bed in the living room so that he would be able to interact with the family and guests.  Betty also slept in the living room on a daybed.  Also living with Betty was her biological grandson, Jason Conrad, whom she and her husband had adopted.  At the time of trial, Jason was approximately 25 years old.  Jason had lived with Betty practically since birth.  He maintained a bedroom on the main level of the house, but also slept in the basement, which had its own bathroom and a separate entrance.

On March 6, 2003, officers from the Lexington, Tennessee police department and surrounding jurisdictions executed a search warrant at Betty's home.  At the time of the raid, Betty, Tony, and Jason were present.  Police confiscated 18.0 grams of crystal methamphetamine residue contained in plastic baggies found in the tank of a toilet in the basement, as well as 71.7 grams of marijuana, also discovered in the basement.  Police also found four firearms, a radio scanner, and $866 in cash.  No one was arrested.

On May 10, 2003, a second search warrant was executed at Betty's home.  Betty and Tony, along with an individual named Gerald Seay, were on the main floor, while Jason and his friend Patrick Britt were in the basement.  During the search, police discovered 1.574 kilograms of methamphetamine hydrochloride, known as "ice," in a dog food bag in the garage.  In a closet in the hall, they found a loaded handgun and a cookie tin containing $14,000 in cash.  In Jason's bedroom, two more firearms were found in the closet.  In the back bedroom, which prior to her husband's accident had been Betty's, police discovered a duffel bag containing clothes and bathroom items along with a digital scale.  These items were identified as Gerald Seay's, as he had been staying in that bedroom.  In the basement, police found more digital scales, a police "call book" (used for identifying police radio codes), two laptop computers, a police scanner, a GPS system, and a Harley-Davidson motorcycle.  As a result of the search, Jason Conrad, Patrick Britt and Gerald Seay were arrested.

On May 29, 2003, a third search warrant was executed at Betty's house.  No drug evidence was collected, but Betty was interviewed by DEA Special Agent Michael Woodham.  Woodham's testimony regarding this interview and the subsequent report he wrote about the interview provided the majority of the evidence used to convict Betty.  According to Woodham's testimony, she told him that Gerald Seay received ice shipments from a Hispanic male whom she knew as Stefan, who lived in Texas.  Seay would call Jason and tell him to go pick up Stefan at the bus station in either Memphis, Jackson, or Nashville.  After picking Stefan up, Jason would bring him back to Betty's house, where Seay and Stefan would conduct the drug transaction.  Woodham testified that Betty told him that Seay had convinced her to allow him to conduct the transactions in her home in exchange for Stefan's promise to arrange for a doctor in Guadalajara, Mexico to treat her husband.  She provided Woodham with a business card of the doctor.

According to Woodham, Betty also identified Arles Wayne Maness and George Melton as partners with Seay in the distribution of methamphetamine.  Maness (who at the time of trial had already been convicted of trafficking almost 600 pounds of marijuana) testified at Betty's trial that Seay had told him that he gave her $1,000 each time he used her basement to conduct drug transactions.

Betty testified on her own behalf.  She stated that Seay was like a son to her and her husband, and had been for over thirty years.  She also stated that she had worked with Stefan in the 1970s at

a sawmill in Tennessee before he moved to Texas.  Stefan, Seay and her husband had all been friends and after Tony's accident in 1997, Stefan and Seay had come to visit him.  She stated she had no idea that drugs were being trafficked through her home until after the May 10, 2003 search. When Jason was released from jail on bond after his arrest on May 10, she was able to have a conversation with him and "he finally told [her] what they were doing."  According to Betty's testimony, Jason told her that he and Seay had been distributing ice for the past year with the help of Stefan.  After this conversation, Betty went to the police station and told the chief of police that the money found in the house was not hers, but rather belonged to Seay, and that she did not want anything to do with it because it was drug money.  When the police arrived on May 29, 2003 to execute the third search warrant, Betty wanted to relay what she had recently found out from Jason to Agent Woodham.

On December 15, 2003, Betty and eight other individuals were indicted by a federal grand jury in the Western District of Tennessee.  She was named in Count 1 for conspiracy to possess and distribute in excess of 50 grams of methamphetamine between 1993 and June 16, 2003 in violation of 21 U.S.C. § 846; in Count 2 for aiding and abetting possession with intent to distribute 17.1 grams of methamphetamine on March 6, 2003 in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; in Count 3 for aiding and abetting possession of a firearm in furtherance of a drug trafficking crime on March 6, 2003 in violation of 18 U.S.C. § 924(c)(1)(2); in Count 9 for aiding and abetting possession with intent to distribute in excess of 50 grams of methamphetamine on May 10, 2003 in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; in Count 10 for aiding and abetting possession of a firearm in furtherance of a drug trafficking crime on May 10, 2003, in violation of 18 U.S.C. § 924(c)(1)(2); and in Count 15 for aiding and abetting possession with intent to distribute in excess of 50 grams of methamphetamine on June 16, 2003, in violation of  21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Betty's first trial commenced on July 26, 2004.  On July 28, it ended in a mistrial with the jury unable to reach a verdict.

In Betty's second trial she was charged only with Counts 1, 2 and 9 of the indictment, and she was found guilty on all three.  She was sentenced to 144 months on Count 1, 144 months on Count 2, and 144 months on Count 9, each to run concurrently.  At the time of sentencing Betty was 62 years old.

II.

**A.      Did the district court err when it allowed the hearsay statement of Gerald Seay to Arles Wayne Maness to be admitted under the co-conspirator exception.**

> "Rule 801(d)(2)(E) states that 'a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy' is not hearsay when introduced against the non-offering party. There are three foundational prerequisites which must be established to admit a coconspirator's statements under Rule 801(d)(2)(E): that a conspiracy existed; that [the] defendant was a member of the conspiracy; and that the declarant's statement was made during the course and in furtherance of the conspiracy. These preliminary matters are findings of fact to be made by the district court pursuant to Fed.R.Evid. 104(a). They must be established by a preponderance of the evidence, and are reviewed only for clear error."

*United States v. Malizewski*, 161 F.3d 992, 1007 (6th Cir. 1998).

Over Betty's objections, the district court allowed Maness to testify that "Gerald [Seay] said he gave [Betty] money for us using her basement because her husband was disabled."  The district court stated the following in support of its decision:

Well, there is a co-conspirator's exception to the hearsay rule. The practice this court follows and is followed throughout most of the circuit is that you can let in a co-conspirator's exception to the hearsay rule subject to a later determination that there actually was a prima facie case of a conspiracy.

It seems to me the government has clearly shown a prima facie case of a conspiracy, and I'm going to let the evidence in under the co-conspirator's exception to the hearsay rule. It sounds like it is a statement made by a co-conspirator during the course and scope of the conspiracy. The objection is overruled.

Betty argues that the government did not prove by a preponderance of the evidence that she was a member of the conspiracy and that the statement was made in furtherance of the conspiracy. She further argues that the district court applied the wrong evidentiary standard – prima facie – instead of the proper preponderance of the evidence standard in deciding these issues. We address these arguments in turn.

### i.          Betty as a Member of the Conspiracy

"Before hearsay statements of a co-conspirator can be entered into evidence, a defendant's participation in the conspiracy must be established . . . by a preponderance of the evidence." *United States v. Clark*, 18 F.3d 1337, 1341 (6th Cir. 1994) (internal citations omitted). Because hearsay is presumptively unreliable, sufficient independent and corroborating evidence of Betty's knowledge and participation in the conspiracy must be produced to rebut and overcome the presumed unreliability of the proffered out-of-court statement. *See id.* (holding that sufficient "independent evidence is not merely a scintilla, but rather enough to rebut the presumed unreliability of hearsay").

Despite Betty's arguments, the government presented sufficient evidence of her participation in the conspiracy prior to the introduction of Seay's out-of-court statement. On two occasions, methamphetamine was found in her home. Agent Woodham testified that Betty herself told him that Jason and Seay used her house for transacting large quantities of methamphetamine. Woodham testified that she told him that Stefan traveled from Texas by bus to her house in order to deliver the methamphetamine to Jason and Seay, and that in exchange for the use of her house, Stefan promised to arrange for a doctor in Guadalajara, Mexico to treat her husband. The government also presented evidence that she was like a mother to Seay and Jason Conrad. She even executed a durable power of attorney on behalf of Seay while he was previously incarcerated for a separate drug offense. She also lied to police during the May 10 search when she stated that the $14,000 cash belonged to her as proceeds from a land sale. She later explained that it was Seay's drug money, and that she was covering for him in the hopes the police would not confiscate it if they believed it was hers.

This evidence "sufficiently corroborates the out of court statements to establish [Betty's] participation in the alleged conspiracy by a preponderance of the evidence." *Id.* at 1342.

### ii.          Out-of-Court Statement Made In Furtherance of the Conspiracy

"A statement is 'in furtherance of' a conspiracy if it is intended to promote the objectives of the conspiracy. The statement need not actually advance the conspiracy to be admissible. Additionally, statements which identify the participants and their roles in the conspiracy are made 'in furtherance' of a conspiracy." *Id.* at 1342 (internal citations omitted). However, out-of-court statements made *after* the conclusion of the conspiracy are not made "in furtherance of the conspiracy," and are thus not admissible under the co-conspirator exception. *See United States v. Martinez*, 430 F.3d 317, 327 (6th Cir. 2005); *United States v. Payne*, 437 F.3d 540, 546 n.4 (6th Cir. 2006 ("[i]t is crucial that the conspiracy be ongoing . . . "). Additionally, "mere idle chatter or casual conversation about past events is not considered a statement in furtherance of the

conspiracy." *United States v. Darwich*, 337 F.3d 645, 657 (6th Cir. 2003) (internal quotation marks omitted).

Seay's out-of-court statement to Maness that "he gave [Betty] money for [] using her basement because her husband was disabled," identified her as a willing participant in the conspiracy and allayed any fears Maness may have had regarding her loyalty to Seay. Thus, the substance of Seay's statement appears to meet the requirement that it be made "in furtherance of" the conspiracy. *See Martinez*, 430 F.3d at 327 (statements are made in furtherance of a conspiracy "when the statements are made to apprise a coconspirator of the progress of the conspiracy, to induce his continued participation, or to allay his fears."). The district court, however, did not make a determination as to *when* this statement occurred, nor did the government offer any evidence regarding the context in which Seay's out-of-court statement to Maness was made. For all this Court knows, Seay's statement could have been made after he was arrested and the conspiracy had ended or was mere "idle chatter." Accordingly, we find the district court erred in failing to make the requisite findings regarding the context and timing of Seay's out-of-court statement before admitting Maness's testimony.

We do not believe such error was harmless. Maness's testimony provided independent corroboration of Agent Woodham's testimony that Betty knew what was going on and was allowing her house to be used for drug transactions in exchange for some benefit. Maness's testimony also helped explain the $14,000 cash found in a cookie tin in the closet. Without his independent corroboration, this case reduces to Woodham's word against Betty's, and the jury may have decided to believe her story over his. Without Maness's testimony, it cannot be said with any confidence that the same verdict would have resulted. *See Beck v. Haik*, 377 F.3d 624, 634-35 (6th Cir. 2004) ("[I]f one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

### iii.    Proper Evidentiary Standard

In order for the co-conspirator exception to apply, the three elements under 801(d)(2)(E) must be proven by a preponderance of the evidence. *See Malizewski*, 161 F.3d at 1007. In overruling Betty's objection to Maness's testimony regarding Seay's out-of-court statement, the district court stated that the government "has clearly shown a prima facie case of a conspiracy," and admitted the evidence under the co-conspirator's exception to the hearsay rule. JA 178. The district court did not find that the government had proven the three requisite elements by a preponderance of the evidence, but rather made the generalized finding that a prima facie case of conspiracy had been presented. The district court never returned to this issue to determine if the government's prima facie showing had risen to the level of a preponderance of the evidence on each of the requisite elements. Accordingly, we find the district court erred in not applying the preponderance of the evidence standard in determining whether the government had met the requirements for the co-conspirator exception under 801(d)(2)(E).

The government concedes that the district court applied the wrong evidentiary standard, but it maintains that this error was harmless. We disagree.

The government relies on this Court's statement in *United States v. Rogers*, 118 F.3d 466, 478 (6th Cir. 1997), that "[t]he erroneous admission of a statement by an unindicted co-conspirator constitutes harmless error when sufficient other evidence demonstrates a defendant's active involvement in the conspiracy." In order for this Court to hold that the district court's use of the wrong evidentiary standard was harmless error, it must find that there was sufficient evidence of Betty's involvement in the conspiracy. *Id.* In *Rogers*, the Court found the evidence was

"overwhelming" that Rogers was involved in the alleged conspiracy. Here, the evidence that Betty was involved in the alleged conspiracy is not nearly so overwhelming.

No evidence was presented that showed Betty ever handled any drugs. There was no evidence that she was ever present during a drug transaction. In fact, all of the testimony indicated that the transactions occurred in the basement and that she was never present. The testimony also revealed that Seay and Jason were the individuals who arranged for the delivery of the methamphetamine with Stefan and distributed it from the basement. Agent Woodham's testimony and his own report state that Betty told him she had never actually observed any illegal activity or drugs.

The only evidence outside of the hearsay tying Betty to the conspiracy to distribute methamphetamine was Woodham's testimony that she had told him that she had agreed to let her house be used in exchange for some benefit, and according to Woodham, that benefit was the prospect of treatment for her husband in Mexico. No other witnesses or evidence was proffered showing that Betty had knowingly agreed to let her house be used. Maness's hearsay testimony was the only *independent* corroborating evidence of any such agreement.

Accordingly, we hold the district court committed reversible error when it admitted Seay's out-of-court statement under the co-conspirator's exception to the hearsay rule using the wrong legal standard and without finding that the elements of that exception had been proven by a preponderance of the evidence. As a result, reversal is necessary because we "lack[] a 'fair assurance' that the outcome of [the] trial was not affected by evidentiary error." *Beck*, 377 F.3d at 635.

**B.      Was the evidence sufficient to sustain Betty's convictions for conspiracy to distribute methamphetamine and possession with intent to distribute methamphetamine.**

While the district court's evidentiary error requires remand, we must still independently address Betty's argument that the evidence presented at trial was insufficient to sustain her conviction. *Patterson v. Haskins*, 470 F.3d 645, 651 (6th Cir. 2006), recently reaffirmed that the general practice in this circuit is to consider an insufficiency claim "even if a remand is necessary because of trial error."

Betty argues on appeal that the evidence was insufficient to support her convictions. When considering such an argument we do not "weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury." *United States v. M/G Transport Services, Inc.*, 173 F.3d 584, 588-89 (6th Cir. 1999). Our task is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony*, any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *Id.* at 589 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Thus, she "bears a very heavy burden" in her sufficiency of the evidence challenge. *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005) (internal citations omitted).

Betty was convicted on the following three counts:  (1) conspiracy to distribute and/or possess with intent to distribute methamphetamine, (2) possession of methamphetamine with intent to distribute on March 6, 2003, and (3) possession of methamphetamine with intent to distribute on May 10, 2003. We analyze each count in turn.

### i.    Conspiracy to Distribute Methamphetamine

"To sustain a conviction under 21 U.S.C. § 846, the government must prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join, and participated in the conspiracy. Although the connection between the defendant and the conspiracy need only be slight, an agreement must be

shown beyond a reasonable doubt. A tacit or material understanding among the parties to a conspiracy is sufficient to establish the agreement. A conspiracy may be inferred from circumstantial evidence which may reasonably be interpreted as participation in a common plan."

*United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002) (internal citations and quotation marks omitted).

Betty argues that there was no evidence that she was a knowing participant in a conspiracy to distribute methamphetamine — rather, she submits that she was an uninformed, concerned mother who got caught up in the illicit dealings of her adopted son and a family friend.

The following evidence was presented by the government in support of Betty's conviction:

- On March 6, 2003, the police found methamphetamine residue in plastic bags in the basement bathroom of Betty's house. Officers also found in the basement a police scanner, a ten-code, a night-vision lens, two television monitors, two surveillance cameras (one in the basement and one mounted outside the house), a rifle and a shotgun.

- On May 10, 2003, the police found approximately 1.5 kilograms of pure methamphetamine in a dog food bag in Betty's garage. During the same search police also found in the hall closet a loaded handgun and a metal cookie tin containing $14,000 cash. Police also discovered a digital scale in her former bedroom, a police scanner, a surveillance camera, and a monitor in Jason's bedroom, and a laptop computer, police scanner and digital scales in the basement.

- On May 29, 2003, Betty was interviewed by Agent Woodham. His testimony regarding that interview states that she gave details about the drug conspiracy between Seay, Jason, and Stefan. In the interview, according to Woodham, she allegedly indicated that in exchange for use of her basement for drug transactions, Stefan would arrange for a doctor in Guadalajara, Mexico, to examine her paraplegic husband.

- Maness testified that Seay had told him he paid Betty $1,000 each time they used her basement for drug transactions.

While this evidence appears to strongly implicate Betty in the conspiracy, it does not paint the whole picture. Betty and her husband were both disabled. They slept in the living room on the main floor. During the March 6 search, all of the evidence seized came from the basement, where Jason, her 25-year-old adopted son (biological grandson) spent most of his time. During the May 10 search, the drugs were found outside the house, and most of the other seized items came from Jason's bedroom or the basement. According to police, a digital scale was found in Betty's former bedroom, but the scale was alongside a duffel bag full of clothes belonging to Seay who had been staying in that bedroom. In fact, the police evidence identification tag stated the scale was found in Seay's bedroom. No evidence was presented that connected Betty to any drug transaction or any of the other items found at the house, and Maness actually testified that he had no reason to believe Betty knew what was going on except for what Seay had told him regarding the $1,000 payments.

It is true that without Maness's testimony regarding Seay's out-of-court statement, the jury could well have refused to conclude that Betty was involved in a conspiracy. That is why we concluded above that the error regarding the Maness testimony was not harmless. The evidence merely shows Betty was present at the house when the drugs were there, but nothing else.

Woodham's testimony that Betty told him that she agreed to let her house be used in exchange for possible treatment for her husband by a Guadalajaran doctor is weak at best, and certainly does not overcome the beyond a reasonable doubt standard. However, if Maness's statement is deemed admissible, then it is possible that a rational trier of fact could have concluded Betty was part of the conspiracy and her conviction should stand.

### ii.    Possession of Methamphetamine on March 6, 2003 and May 10, 2003

As discussed above, on March 6, 2003, methamphetamine residue was found in plastic baggies behind the tank of a toilet in the basement bathroom. This area of the house was used exclusively by Jason. In fact because of Betty's and her husband's disabilities they had difficulty navigating stairs. The government did not present any evidence that Betty used the basement or the basement bathroom. Nor did it present any evidence that she had actually handled the drugs or baggies found in the basement. In fact, all of the evidence relating to the March 6 possession points to Jason, not Betty.

On May 10, 2003, the drugs were found in a dog food bag in the carport. Betty testified she fed the dog on a regular basis. She had access to the carport and presumably used the carport daily. No other evidence was presented that showed she knew the drugs were there or intended to possess or distribute them.

On both counts, the government has failed to present any evidence that Betty knew the drugs were there or in any way assisted in the possession or distribution of the drugs. In fact, both the report authored by Agent Woodham and his testimony at trial state that she did not observe any drugs or any illegal activity. The mere fact that drugs were found outside of her home and in her basement is not sufficient to sustain a conviction for aiding in abetting in the possession with intent to distribute these drugs. The government must provide some evidence of Betty's participation in these crimes. In *United States v. Pena*, 983 F.2d 71 (6th Cir. 1993), and *United States v. Craig*, 522 F.2d 29 (6th Cir. 1975), this Court held that mere presence in a place where drugs were discovered is not enough to sustain a conviction for aiding and abetting in possession with intent to distribute illegal drugs. In fact, in *Pena*, the Court stated that even if the defendant had known illegal drugs were present, it still was not enough to sustain a conviction. 983 F.2d at 73. In *Craig*, the Court found that even where the defendant fled from police officers and possessed a shotgun, without evidence of his knowledge of and willing participation in the possession of the illegal drugs, a conviction could not be sustained. 522 F.2d at 31-32. Here, apart from the inadmissible hearsay evidence, the government presented no evidence of Betty's participation in the crime other than her presence at her house where drugs were found. A jury could therefore well refuse to convict. Again, that is why we found above that the error was not harmless. "The web of inference is too weak on these facts to permit any rational trier of fact, absent sheer speculation, to find *beyond a reasonable doubt* that [Betty] had knowledge of the hidden *drugs*." *United States v. Morrison*, 220 F. App'x 389, 396 (6th Cir. 2007) (internal quotation marks omitted). It appears that she was improperly lumped together with others who were more culpable. *See United States v. Pena*, 983 F.2d 71, 73 (6th Cir. 1993) ("guilt by association" not sufficient to sustain a conviction for possession). But with the the improperly admitted hearsay evidence, there was sufficient evidence to sustain her conviction on these two counts. Under the principle reemphasized in *Patterson*, therefore, we are not required on double-jeopardy grounds to preclude a retrial because of insufficient evidence.

### III.

For the foregoing reasons, we **REMAND** Betty's case to the trial court to conduct the inquiry that should have been made under Rule 801(d)(2)(E). *See United States v. Mahar*, 801 F.2d

1477, 1503-04 (6th Cir. 1986). In the event the trial court determines on remand that the improperly admitted out-of-court statement was made in the course of and in furtherance of the conspiracy, Betty's conviction will stand and we would have appellate jurisdiction of this case in order to review the trial court's finding. If the trial court determines that the out-of-court statement was not made in the course of and in furtherance of the conspiracy, Conrad is entitled to a new trial. *See Lockhart v. Nelson*, 488 U.S. 33, 40 (1988).