NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0459n.06

No. 19-5953

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 04, 2020
DEBORAH S. HUNT, Clerk

)
UNITED STATES OF AMERICA, )
         )
          Plaintiff-Appellee, )
         )
v. )
         )
LAMAR THORNTON, )
         )
          Defendant-Appellant. )
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

OPINION

---

Before: SUHRHEINRICH, GIBBONS, and BUSH, Circuit Judges.

**JOHN K. BUSH, Circuit Judge.** Lamar Thornton was convicted of conspiracy to distribute ten grams or more of heroin and carfentanyl, in violation of 21 U.S.C. § 846. He was sentenced to 292 months' imprisonment. He now appeals his conviction and sentence. For the reasons stated below, we **AFFIRM** the judgment of the district court.

**I.**

This is a case about the unlawful distribution of heroin and carfentanyl. The latter is a drug designed for use as an elephant tranquilizer but also abused for human consumption, utilized on its own or mixed with heroin. Defendant Lamar Thornton oversaw distribution of these drugs into Lexington, Kentucky and the surrounding area.

The story of Thornton's arrest and prosecution centers around two main characters. The first is Thomas Lehmann, who overdosed after consuming carfentanyl on January 8, 2017. Authorities found Lehmann in his car, along with "all kinds of drugs": 32 grams of what Lehmann

believed to be heroin, 47 grams of methamphetamine, a half-ounce of marijuana, 32 Xanax pills, and "some suboxones." Lehmann was taken into custody and later pleaded guilty to conspiring to distribute drugs with Thornton.

Lehmann testified at trial that he first met Thornton at a Dollar Tree store in Lexington, Kentucky. There, Thornton gave Lehmann two grams of heroin for free. (The typical user amount for a single dose of heroin ranges from a tenth to a quarter of a gram.) At the time, Lehmann was consuming between two and three grams of heroin a day. Thornton brought his associate Darmon Shaw with him to the meeting. Thornton "directed" Lehmann to contact "Little Bro," as Thornton called Shaw, for any future transactions. Thereafter, Lehmann regularly purchased heroin from Shaw both for himself and to sell to his customers. Lehmann also testified that after he was incarcerated, he referred a customer, Brian Wylie, to Thornton for his heroin while Lehmann was in prison. Thornton then called Wylie and invited him to Detroit so they "could start doing business."

The second main character is Jerrod Doolin. In January 2017, Jared Sullivan, a special agent with the Drug Enforcement Administration, received a call that one of Doolin's drug customers had overdosed. Agent Sullivan eventually obtained a warrant to search Doolin's residence, and upon executing the warrant, authorities found heroin, carfentanyl, and other items indicative of drug trafficking. Doolin was not present during the search, but Jeff Ruggiero, a fellow drug trafficker, was there. Sullivan used Ruggiero to locate Doolin. Eventually, Sullivan and other officials performed a traffic stop of Doolin's vehicle, where they found cash and drug paraphernalia. While interviewing Doolin at the police station, Sullivan looked through Doolin's phone and found "text messages indicative of drug trafficking." A number of those messages came from an out-of-state phone number associated with Thornton. Doolin also identified Thornton,

known to him by Thornton's street name "Juice," as his drug supplier. Like Lehmann, Doolin purchased heroin and carfentanyl from Thornton but principally transacted with Shaw, whom Doolin also knew as Little Bro. During a three-month period between the end of 2016 and January 2017, Doolin purchased 30 grams of heroin or carfentanyl from Thornton and Shaw once or twice a week.

Based on this information from Doolin, Sullivan applied for an authorization order to obtain GPS location information for Thornton's out-of-state phone number. In his sworn affirmation in support of the application, Sullivan stated that Doolin had identified the phone number as belonging to Thornton, that Thornton had called Doolin from the number while Doolin was being interviewed by police, that local police knew Juice to be Thornton's street name, and that Doolin had identified Thornton as Juice in a photo lineup. The magistrate judge agreed that locating the cell phone would lead to evidence of controlled-substance offenses and granted authorization to obtain the location information.

According to the GPS data, the phone was consistently located at a residence in Detroit that matched the address on Thornton's driver's license. Authorities obtained a search warrant for the residence and an arrest warrant for Thornton, whom they took into custody after he left his residence in a vehicle with Shaw on January 19, 2017. Sullivan confiscated four cell phones from Thornton, one of which matched the cell phone number described in the authorization order. The officers then placed Thornton and Shaw in the back of a police cruiser where, unbeknownst to the arrestees, Sullivan was recording. The audio captured Thornton's voice as he used Shaw's cell phone to call his girlfriend and instruct her to tell her father to "get the guns out of the house," "flush" items in a backpack, and contact T-Mobile to ask whether "they could remotely wipe his phones."

At Thornton's residence, authorities found evidence that the house was being used to "cut or process drugs." Authorities also found a handgun, prescription pills, 99.6 grams of carfentanyl and 114.7 grams of a mixture of carfentanyl, heroin, and allergy medication—altogether equal to roughly 2,000 individual-use doses. In an interview following his arrest, Thornton admitted that those drugs belonged to him.

Before trial, Thornton filed a motion to suppress the evidence found at his residence and a motion to dismiss the indictment based on an alleged violation of his Sixth Amendment right to a speedy trial. The district court denied both motions.

A jury convicted Thornton of conspiracy to distribute a mixture or substance containing heroin and carfentanyl in violation of 21 U.S.C. § 846. Thornton's Presentence Report calculated his base offense level to be 30 for a drug offense involving the equivalent of more than 1,000 but less than 3,000 kilograms of marijuana, with a two-level sentence enhancement for possession of a firearm, four-level sentence enhancement for being the organizer or leader of a criminal activity involving five or more participants, and a two-level sentence enhancement for obstruction of justice. With Thornton's adjusted offense level and his criminal history, the probation office recommended a Guidelines range of 292–365 months. The district court agreed with the Presentence Report and, after considering the factors under 18 U.S.C. § 3553(a), sentenced Thornton to 292 months' imprisonment.

## II.

Thornton raises four arguments on appeal. First, he argues that the court order authorizing collection of location data from his cell phone violated the Fourth Amendment. Second, he argues that his Sixth Amendment right to a speedy trial was violated. Third, he argues that the government

did not proffer sufficient evidence to sustain his conviction. Fourth, he argues that his sentence was procedurally and substantively unreasonable. We address each in turn.

A.

Under the Fourth Amendment, "a search warrant may be issued only 'upon probable cause supported by an oath or affirmation, and particularly describing the place to be searched, and the things to be seized.'" *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018) (quoting U.S. Const. amend. IV).

Thornton contends that the court order authorizing the collection of location data from his cell phone violated the Fourth Amendment because it was supported by an "affirmation," rather than an affidavit, and that affirmation did not establish probable cause. We review these claims for plain error because Thornton failed to lodge these specific objections below. *See United States v. Buchanon*, 72 F.3d 1217, 1226–27 (6th Cir. 1995). Under that standard, Thornton must show (1) an "error," (2) that was "clear or obvious," (3) "affect[ed] [his] substantial rights," and (4) that "seriously affect[ed] the fairness, integrity or public reputation" of judicial proceedings. *United States v. Ramer*, 883 F.3d 659, 677 (6th Cir. 2018) (quotations omitted).

Thornton has not shown any error, let alone plain error. First, the government was free to support its application for a warrant by an "affirmation," rather than an affidavit. *United States v. Hang Le-Thy Tran*, 433 F.3d 472, 482 (6th Cir. 2006) ("The Fourth Amendment does not require that the basis for probable cause be established in a written affidavit; it merely requires that the information be given by 'Oath or affirmation' before a judicial officer.").

Second, the affirmation established probable cause. In assessing whether there is probable cause to issue a search warrant, the task of the issuing magistrate is to determine whether "there is a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime

will be found in a particular place." *Id.* (quoting *United States v. Shields*, 978 F.2d 943, 946 (6th Cir. 1992)). To establish probable cause, a nexus must exist between the place to be searched and the sought-after evidence. *See United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005). Here, the affirmation stated that authorities stopped Jerrod Doolin, who had been identified as a heroin dealer and who had a distribution amount of heroin in his possession. Doolin, in turn, identified his supplier as an individual known to him as Juice. When questioned about a phone number in his cell phone, Doolin identified the phone number in question as one that Juice had used for three or four weeks. Local police knew Juice to be Thornton and had previously arrested him with 96 grams of heroin in his possession. Doolin confirmed that identification when he identified Thornton as Juice in a photo lineup. And while Doolin was being interviewed, Thornton called him and said that he had "150" for Doolin, which Doolin interpreted to mean that Thornton had 150 grams of heroin for him to sell. This evidence was more than sufficient to establish a nexus between Thornton's cellphone location data and drug trafficking offenses.

## B.

Thornton also claims that his Sixth Amendment right to a speedy trial was violated. The Sixth Amendment guarantees in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. "The purpose of the speedy-trial guarantee is to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." *Brown v. Romanowski*, 845 F.3d 703, 712 (6th Cir. 2017) (collecting cases). We review "questions of law related to speedy-trial violations de novo and questions of fact for clear error." *United States v. Sutton*, 862 F.3d 547, 554 (6th Cir. 2017) (citing *United States v. Carroll*, 26 F.3d 1380, 1390 (6th Cir. 1994)).

In *Barker v. Wingo*, the Supreme Court established a four-factor test for determining whether a defendant's constitutional right to a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. 407 U.S. 514, 530 (1972). "[N]one of the four factors [is] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id.* at 533. And even if all four *Barker* factors are satisfied, a court is not required to conclude that a defendant's speedy trial right has been violated. *Id.*

### 1. Length of the Delay

The first *Barker* factor—the length of the pre-trial delay—functions both as a triggering mechanism and as a measure of the severity of the prejudice suffered by an accused. First, the delay must be lengthy enough to warrant a constitutional analysis at all, "since, by definition, [a defendant] cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." *Doggett v. United States*, 505 U.S. 647, 651–52 (1992) (citing *Barker*, 407 U.S. at 530–31). Delays of over a year "generally" satisfy the lengthiness requirement, thereby calling for the full *Barker* analysis. *Id.* at 652 n.1.

Here, the delay extended well beyond one year, as Thornton was indicted on February 9, 2017, and his trial began on February 25, 2019. Accordingly, we proceed to the other factors.

### 2. The Reason for the Delay

"In assessing the second factor, the reason for the delay, the court considers who is most at fault—the government or the defendant." *Romanowski*, 845 F.3d at 714. "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government," while a "more neutral reason such as negligence or overcrowded courts should be weighted less

heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker*, 407 U.S. at 531.

Here, the overwhelming majority of delays were due to several pre-trial motions filed by Thornton, and no delays were solely attributable to the United States. This factor thus weighs in the government's favor. *See United States v. Taylor*, 489 F. App'x 34, 47 (6th Cir. 2012) (noting that, when a delay is caused by the actions of the defendant and his counsel by filing numerous motions, this factor weighs in favor of concluding that a defendant's speedy-trial rights were not violated).

### 3. Thornton's Assertion of his Right

The third *Barker* factor, the defendant's assertion of his right to a speedy trial, "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531–32. "Although a defendant does not waive the right to a speedy trial by failing to assert it, the degree to which the defendant has asserted the right is one of the factors to be considered in the balance." *United States v. Brown*, 169 F.3d 344, 350 (6th Cir. 1999) (citing *Barker*, 407 U.S. at 531–32). This factor is a measure of how quickly the defendant asserted his right to a speedy trial "in the context of the overall delay." *United States v. Watford*, 468 F.3d 891, 907 (6th Cir. 2006).

Thornton first referenced his right to a speedy trial on October 19, 2018, twenty-one months after his indictment. In the interim, he filed a host of motions requiring delay of his trial. Thornton's belated assertion "'cast[s] doubt on the sincerity of the demand' and weigh[s] in favor of the government." *Sutton*, 862 F.3d at 561 (quoting *United States v. Flowers*, 476 F. App'x 55, 63 (6th Cir. 2012)).

**4.** **Prejudice to Thornton**

The last *Barker* factor is concerned with the prejudice suffered by the defendant. "A defendant must show that 'substantial prejudice' has resulted from the delay." *United States v. Schreane*, 331 F.3d 548, 557 (6th Cir. 2003) (quoting *United States v. White*, 985 F.2d 271, 276 (6th Cir. 1993)). "[P]rejudice[] should be assessed 'in the light of' three interests: (1) to prevent oppressive pretrial incarceration, (2) to minimize anxiety and concern due to unresolved criminal charges, and (3) to minimize damage to the defense." *Sutton*, 862 F.3d at 561–62 (6th Cir. 2017) (quoting *Barker*, 407 U.S. at 532). Damage to the defense is the "most serious," *Barker*, 407 U.S. at 532, and the defendant must demonstrate "how his defense was prejudiced *with specificity*," *United States v. Young*, 657 F.3d 408, 418 (6th Cir. 2011) (emphasis in original) (quoting *United States v. Howard*, 218 F.3d 556, 564 (6th Cir. 2000)). When the defendant fails to "articulate the harm caused by delay, the reason for the delay (factor 2) will be used to determine whether the defendant was presumptively prejudiced." *United States v. Williams*, 753 F.3d 626, 634 (6th Cir. 2014) (quoting United *States v. Mundt*, 29 F.3d 233, 236 (6th Cir. 1994)).

Thornton vaguely asserts that he has been unable to properly prepare for his defense given his incarceration. But he provides no specifics. Because Thornton's filing several motions was the primary reason for the delay in his case, and there is no evidence that the government acted in bad faith or negligently to cause the delay, Thornton's Sixth Amendment claim must fail.

C.

We next consider the sufficiency of the evidence to support Thornton's conviction. We apply de novo review. *See United States v. Collins*, 799 F.3d 554, 589 (6th Cir. 2015). "A defendant challenging the sufficiency of the evidence 'bears a very heavy burden.'" *Id.* (quoting *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005)). In evaluating a sufficiency

challenge, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We "neither independently weigh[] the evidence, nor judge[] the credibility of witnesses who testified at trial." *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999).

Thornton was convicted of conspiring to distribute a controlled substance, in violation of 21 U.S.C. § 846. To establish a conspiracy under § 846, "the government must prove [1] the existence of an agreement to violate the drug laws and [2] that each conspirator knew of, intended to join, and participated in the conspiracy." *United States v. Volkman*, 797 F.3d 377, 390 (6th Cir. 2015) (quoting *United States v. Conrad*, 507 F.3d 424, 432 (6th Cir. 2007)). "The connection between a defendant and the conspiracy need only be slight," *id.* (quoting *United States v. Craft*, 495 F.3d 259, 265 (6th Cir. 2007)), and a "conspiracy may be inferred from circumstantial evidence which may reasonably be interpreted as participation in a common plan," *Conrad*, 507 F.3d at 432.

The government produced sufficient evidence to convict Thornton of violating 21 U.S.C. § 846. The evidence showed that Thornton developed business relationships with Jerrod Doolin and Thomas Lehmann, who then distributed drugs in the Lexington area. Thornton then directed them to work through another associate, Darmon Shaw, whom they knew as "Little Bro." For much of late 2016 and early 2017, Doolin purchased heroin several times a week from Shaw, who had received the heroin from Thornton. Doolin then turned around and sold the drugs to his own customers.

Thornton also supplied heroin to Lehmann, who in turn sold to his own clients around Lexington. Lehmann purchased his drugs from Shaw, as Thornton had directed. Thornton and

Shaw "fronted" some of the drugs that they provided to Lehmann, meaning that Lehmann paid only part of the purchase price when he obtained the drugs, and paid the balance back when he had sold drugs to his own customers. Lehmann purchased heroin from Thornton, through Shaw, for two months. In the weeks leading up to his arrest, Lehmann purchased between thirty and thirty-two grams at a time, several times per week.

On the day he was arrested, Lehmann purchased 32 grams (approximately 320 doses) of carfentanyl from Shaw. Also, after his arrest, Lehmann called Thornton from jail to suggest that Lehmann's associate Brian Wylie take over for Lehmann while the latter was in prison. Thornton then called Wylie to invite him to Detroit to join in his scheme, but Wylie refused to go. Both Doolin and Lehmann cooperated against Thornton, describing to law enforcement how they purchased heroin in Lexington from Shaw, who was supplied in Detroit by Thornton.

After his arrest, Thornton called his girlfriend demanding that she destroy evidence. A search of Thornton's vehicle revealed more than $900 in cash and four cell phones. A search of his residence revealed drug paraphernalia, nearly 100 grams of heroin mixed with carfentanyl, and approximately 114 grams of carfentanyl. The quantity of drugs represented over 2,000 individual doses with a street value of more than $20,000.

From this evidence, a rational factfinder could conclude beyond a reasonable doubt that there existed an agreement between Thornton and others to distribute drugs and that Thornton was an active participant in the scheme. Thornton regularly communicated with Doolin and Lehmann. He was arrested with Shaw in his vehicle. Both Doolin and Lehmann obtained their drugs from Shaw, who acted as Thornton's middleman.

Thornton claims that he was not engaged in a larger conspiracy, but rather he engaged in nothing more than a few individual drug transactions. To be sure, a "buyer-seller relationship

alone is insufficient to tie a buyer to a conspiracy." *United States v. Deitz*, 577 F.3d 672, 680 (6th Cir. 2009) (quotations omitted). But, we have "often upheld conspiracy convictions where there was additional evidence . . . from which the knowledge of the conspiracy could be inferred." *Id.* We have identified four factors in determining whether a series of drug transactions comprise part of a larger conspiracy: "(1) the length of the relationship; (2) the established method of payment; (3) the extent to which transactions are standardized; and (4) the level of mutual trust between the buyer and the seller." *Id.* at 681 (citation omitted).

Here, the evidence established far more than a simple buyer-seller relationship. Thornton was not a buyer, but rather a seller to, at a minimum, two buyers—Doolin and Lehmann. Thornton's relationship with those individuals lasted for several months, and at least as to Lehmann, involved sales on credit. *See United States v. Lopez-Medina*, 461 F.3d 724, 747 (6th Cir. 2006) (noting that "fronting" drugs to a buyer may demonstrate more than a mere buyer-seller relationship). Those sales were standardized, as Doolin and Lehmann regularly purchased 30 grams of heroin and carfentanyl multiple times a week through Thornton's middleman, Shaw. Evidence of repeated purchases involving large quantities of drugs is evidence of a conspiracy rather than a buyer-seller relationship. *United States v. Martinez*, 430 F.3d 317, 332–33 (6th Cir. 2005). Over the course of the conspiracy, Lehmann and Doolin received hundreds of grams of heroin and carfentanyl, which translated to thousands of individual doses. And there was significant trust between Doolin, Lehmann and Thornton. Both Doolin and Lehmann warned Thornton to be careful after they had been arrested, and Lehmann tried to find a replacement to take over his distribution ring while he was in custody.[1]

---

[1] Thornton briefly argues that the evidence is insufficient to sustain his conviction because the government failed to prove that he knew he was distributing carfentanyl rather than heroin. That argument has no merit because the government only had to prove that Thornton knew "that the substance he [was] dealing with [was] some unspecified substance listed on the federal drug schedules." *McFadden v. United States*, 576 U.S. 186, 191 (2015).

D.

Finally, Thornton challenges the procedural reasonableness of his sentence.[2]  We review

the reasonableness of a sentence for abuse of discretion.  *United States v. Dunnican*, 961 F.3d 859,

880 (6th Cir. 2020) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).  Any factual findings

made at sentencing are reviewed for clear error.  *United States v. West*, 962 F.3d 183, 187 (6th Cir.

2020). A procedural reasonableness challenge "requires us to ensure that the district court: (1)

properly calculated the applicable advisory Guidelines range; (2) considered the other 18 U.S.C.

§ 3553(a) factors as well as [arguments for a sentence outside the range]; and (3) adequately

articulated its reasoning for imposing the particular sentence chosen."  *Id.* (quotation omitted)

(alteration in original).  Thornton challenges his base offense level and three enhancements that

the district court imposed.  We review each in turn.

### 1.      Base Offense Level

Thornton first challenges his base offense level of 30.  "For defendants convicted of drug

crimes, the base offense level at sentencing depends on the amount of drugs involved in the

offense."  *United States v. Averill*, 636 F. App'x 312, 315 (6th Cir. 2016) (citing U.S.S.G.

§ 2D1.1(c)).  The district court's drug-quantity determination is reviewed for clear error.  *United*

*States v. Rios*, 830 F.3d 403, 436 (6th Cir. 2016).  In reaching that determination, "[t]he district

court may rely on any competent evidence in the record."  *United States v. Hough*, 276 F.3d 884,

891 (6th Cir. 2002).

---

[2] Thornton mentions, in a heading, that he is also challenging the substantive reasonableness of his sentence. However, he has failed to present any arguments as to why his 292-month sentence—which is at the very bottom of the Guideline recommendation—was substantively unreasonable.  He has therefore forfeited his substantive reasonableness challenge.  *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (first and third alterations in original) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited].  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citations omitted)).

The district court held Thornton accountable for 672 grams of heroin and 32 grams of carfentanyl that Thornton distributed to Lehmann and 215 grams of carfentanyl that was found in Thornton's residence after his arrest. Those amounts, under the Guidelines, are equivalent to 1,286.8575 kilograms of marijuana, which sets a base offense level of 30. U.S.S.G. §2D1.1(c)(5), cmt. n.8.

Thornton contends that he should not be held accountable for the 672 grams of heroin and 32 grams of carfentanyl that were in Lehmann's possession. Under the Guidelines, a defendant's base level can be enhanced based on the acts of others within a conspiracy. *See* U.S.S.G. § 1B1.3(a)(1)(B). "[I]n order to hold a defendant accountable for the acts of others [under § 1B1.3(a)(1)(B)], a district court must make two particularized findings: (1) that the acts were within the scope of the defendant's agreement; and (2) that they were foreseeable to the defendant." *United States v. Campbell*, 279 F.3d 392, 399–400 (6th Cir. 2002) (quotation omitted).

The district court made both requisite findings. The district court found that Thornton and Lehmann agreed to an arrangement whereby Thornton would traffic drugs from Detroit to Central Kentucky, where the drugs would then be distributed by other people. The district court then found that, because Lehmann contacted Thornton to be a distributor in Kentucky, it was reasonably foreseeable that Lehmann would possess Thornton's drugs.

Thornton contends that Lehman was an "unreliable witness" and thus lacked credibility. But, the district court concluded that Lehmann's testimony was credible. The district court heard evidence from Doolin and Lehmann that confirmed the drug quantity and heard other corroborating evidence that supported the drug quantity. We find no error in Thornton's base offense level.

### 2.     Firearm Enhancement

Thornton next challenges his enhancement for a drug offense that involved a firearm. *See* U.S.S.G. § 2D1.1(b)(1). The enhancement applies "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 cmt. n.11(A). The government must establish by a preponderance of the evidence that a defendant possessed the firearm during the drug trafficking crime. *United States v. Miggins*, 302 F.3d 384, 390–91 (6th Cir. 2002).

Here, officers found a loaded .380 caliber handgun on a shelf on a mantel on top of several pills. It was in close proximity to the room where there was drug manufacturing equipment, drug paraphernalia, and over 200 grams of heroin and carfentanyl. And, when Thornton was in the back of the police cruiser after being arrested, he called his girlfriend to tell her father to get rid of the guns that Thornton had stored in his home. The district court did not clearly err in determining that the handgun found alongside several pills and in close proximity to heroin, carfentanyl, manufacturing materials, and paraphernalia, was used during the commission of the offense. Likewise, it was not "clearly improbable that the weapon was connected with the offense." U.S.S.G. §2D1.1 cmt. n.11(A).

### 3.     Aggravating-Role Enhancement

Thornton next challenges his aggravating-role enhancement. The enhancement applies when a defendant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a)(1). "We review the factual findings of the district court on this issue for clear error and accord deference to the legal conclusion that a person is an organizer or leader under Section 3B1.1. *United States v. Olive*, 804 F.3d 747, 759 (6th Cir. 2015) (citing *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013)). Relevant

factors include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. n.4.  In addition, a defendant need only have led "one . . . other participant[]." *Id.* § 3B1.1 cmt. n.2.

The district court did not err in imposing this enhancement.  Thornton contends that the crime did not involve five people, but the district court found otherwise.  Thornton's drug-distribution scheme involved, at a minimum, himself, Shaw, Lehmann, Doolin, and Ruggiero. There was also Wylie, who watched over Lehmann's drug supply and nearly took over Lehmann's role in the conspiracy, as well as several unidentified participants who were noted at trial. Testimony also showed that Thornton exercised a great deal of authority over his co-conspirators, that he actively participated in recruiting dealers, and that he sold drugs himself.  The district court did not clearly err in imposing this enhancement.

### 4.       Obstruction-of-Justice Enhancement

Finally, Thornton challenges the obstruction-of-justice enhancement.  We review the district court's factual findings for clear error and its determination of the enhancement's applicability de novo.  *See United States v. Watkins*, 691 F.3d 841, 851 (6th Cir. 2012).  The enhancement applies where a defendant "willfully obstructed or impeded, or attempted to obstruct or impede . . . the investigation" that resulted in the defendant's conviction.  U.S.S.G. § 3C1.1(1). Obstruction under the Guidelines includes "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation . . . or attempting to do so." *Id.* § 3C1.1 cmt. n.4(D). Where "such conduct occurred contemporaneously

with arrest," the enhancement applies if that conduct "resulted in a material hindrance to the official investigation or prosecution." *Id.*; *see United States v. Lineberry*, 7 F. App'x 520, 524–25 (6th Cir. 2001) (per curiam) ("Concealing evidence material to an official investigation or judicial proceeding, or directing or procuring another person to do so, or attempting to do so, will trigger an enhancement for obstruction of justice.").

The district court did not err in imposing this enhancement. After his arrest, Thornton made two phone calls to his girlfriend, in which he directed her to tell her father to dispose of the guns in his home, to flush contraband, and to erase Thornton's phones, among other things. In a third call, the girlfriend confirmed that her father did what Thornton had asked. Because Thornton attempted to "destroy[] or conceal[] or procur[e] another person to destroy or conceal evidence," U.S.S.G. § 3C1.1 cmt. n.4(D), which likely resulted in a material hindrance to the investigation, the district court did not err in imposing an obstruction-of-justice enhancement.

## III.

For the reasons discussed above, we **AFFIRM** Thornton's conviction and sentence.